# EXHIBIT 14

2

```
 1              A P P E A R A N C E S

 2   On behalf of the Plaintiffs:

 3          ALLISON H. GODDARD, ESQ.
            PATTERSON LAW GROUP
 4          402 West Broadway
            29th Floor
 5          San Diego, California 92101
            Phone: (619) 398-4760
 6          Fax:   (619) 756-6991
            ali@pattersonlawgroup.com
 7

 8   On behalf of the Defendants:

 9          ADAM C. SMEDSTAD, ESQ.
            SCOPELITIS GARVIN LIGHT HANSON & FEARY
10          30 West Monroe Street
            Suite 600
11          Chicago, Illinois 60603
            Phone: (312) 255-7200
12          Fax:   (312) 422-1224
            asmedstad@scopelitis.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2     EXAMINATION BY:                                PAGE:

3          MR. SMEDSTAD                               4

4

5

6

7                    E X H I B I T S

8     DEFENDANTS' EXHIBIT:                           PAGE:

9     1          Original Declaration, 39 pages       9

10    2          Amended Declaration, 35 pages        11

11    3          Plaintiffs' Second Amended           14
                 Complaint, 26 pages
12
      4          Driver's Log, Bates stamped          76
13               MT617 and MT618

14    5          Google Maps Printout, 1 page         89

15    6          Invoice, 5 pages                     107

16

17

18

19

20

21          (Exhibits attached to the transcript.)

22

23

24

25

Appx. 270

4

1             JOSEPH A. KROCK, Ph.D.,

2 called as a witness by the Defendants, who, having been

3 duly sworn by me, was examined and testified as

4 hereinafter set forth.

5                    ---oOo---

6        EXAMINATION BY COUNSEL FOR THE DEFENDANTS

7 BY MR. SMEDSTAD:

8     Q    Would you state your name for the record.

9     A    My name is Joseph Krock.  Last name is

10 K-r-o-c-k.

11    Q    And I know you've been deposed before.  How

12 many times have you been deposed?

13    A    Somewhere between 15 and 20.

14    Q    When I looked over your C.V., I did not take

15 personal umbrage at the fact that you did not list a

16 deposition in connection with the Garcia matter.

17         Was that an oversight?

18    A    Shouldn't have been.  I don't know if it's in

19 there now, but...

20    Q    I'm going to be handing you your report, and

21 it's on the first exhibit, I think, so you can take a

22 look at that.

23         Would you briefly describe your educational

24 background.

25    A    I received a Bachelor's of Arts degree in

1     Q    Now, looking at Summary Conclusion ii on page

2  4, it's my understanding that you have withdrawn your

3  opinions relating to this summary conclusion; is that

4  correct?

5     A    That's correct.

6     Q    Do you know why you're withdrawing those

7  opinions?

8     A    Counsel asked me to withdraw that.

9     Q    Do you know why Ms. Goddard asked you to

10 withdraw those opinions?

11    A    I do not.

12    Q    Did Ms. Goddard explain why she asked you to

13 withdraw those opinions?

14    A    No.

15    Q    Did you have any concerns regarding

16 withdrawing your opinions at Ms. Goddard's request?

17    A    No.

18    Q    You indicate in Footnote 1 of Exhibit 1 that

19 you have not been asked to offer any opinions regarding

20 the time that plaintiffs spent in orientation, correct?

21    A    That's correct.

22    Q    So you have no opinions regarding the

23 plaintiffs' orientation claims, correct?

24    A    That's correct.

25    Q    Do you know why you were not asked to offer

1 any opinions regarding plaintiffs' orientation claims?

2     A     I do not.

3     Q     Are any of your opinions based on information

4 you received directly from talking with the plaintiffs?

5     A     No.

6     Q     Have you ever talked with the plaintiffs?

7     A     No.

8     Q     Have you ever read the plaintiffs'

9 depositions?

10     A     Let me review what I've reviewed.  I did not

11 spend -- if they were given to me, I reviewed them

12 quickly but I did not spend a great amount of time, but

13 I'm not sure.

14           No.

15     Q     So you did not discuss your analysis with the

16 plaintiffs to see if it was consistent with what they

17 said they were doing during their employment with May

18 Trucking, correct?

19     A     That's correct.

20     Q     Why not?

21     A     I was not asked to.

22     Q     Wouldn't that have been a way to test the

23 validity of some of the assumptions that underlie your

24 analysis?

25           MS. GODDARD:  Objection.  Calls for

1 speculation.

2          THE WITNESS:  I was asked to make those

3 assumptions by counsel.

4 BY MR. SMEDSTAD:

5     Q    I understand that.  But my question is related

6 to your work as an expert.  Wouldn't a way that you

7 would -- wouldn't you consider talking with the

8 plaintiffs a way of validating the assumptions you were

9 asked to make?

10    A    Well, ultimately the analysis will depend on a

11 legal opinion arrived at by the Court.  And my opinion

12 about whether or not the analysis could be performed in

13 a general sense is not particular to the assumptions

14 that are made.

15    Q    Well, your analysis relates to what the

16 plaintiffs were doing while they were employed at May

17 Trucking, right?

18    A    Yes.

19    Q    The activities they were performing?

20    A    That they were recording in their driver's

21 logs, yes.

22    Q    That they said they were performing?

23    A    Yes.

24    Q    Wouldn't it have been helpful to talk to them

25 about the accuracy of the logs you were relying on?

1      you based your analysis matter to the

2      accuracy of your opinions that you've

3      offered in this case?")

4      THE WITNESS:  No.

5 BY MR. SMEDSTAD:

6      Q    Okay.  So the calculations that you've

7 performed are accurate regardless of whether or not the

8 data, the logs, on which you relied are accurate; is

9 that correct?

10     A    The calculations are as accurate as the data,

11 the driver's logs are.

12     Q    Did you do anything to validate the data on

13 which you based your calculations?

14     A    Again, the opinion is whether or not this can

15 be done.  I did not validate the data.  I didn't have a

16 reason to believe that it was inaccurate.

17     Q    Is it your typical practice not to validate

18 data that you're relying on?

19     A    Well, to the extent that validating data is

20 possible, and oftentimes it's not possible to validate

21 the data, you have to take it as it is and understand

22 what the potential limitations there are to it.

23     Q    As an expert, can you think of any way in

24 which you would have validated the data on which you

25 relied on in this case?

1       MS. GODDARD:  Objection.  Incomplete

2  hypothetical.  Calls for speculation.

3       THE WITNESS:  I'm unaware of another way to

4  validate this data.  Deposition testimony is not going

5  to be detailed enough to validate a particular day's

6  events.  And I'm not aware of other pieces of data that

7  would corroborate or refute what we found in the

8  driver's logs.

9  BY MR. SMEDSTAD:

10      Q    As you sit here today, do you have any basis

11  on which to opine as to the validity of the data that

12  you analyzed in coming to your conclusions in this case?

13      A    I understand that the driver's logs were kept

14  as a matter of the Department of Transportation

15  regulations, and that there are reasons why that's kept

16  from -- in the transportation industry.  So that would

17  give me a reason to believe that it has to be more

18  accurate than less.

19      Q    Do you have any basis on which to opine as to

20  the validity of the data that you analyzed in coming to

21  your conclusions in this case?

22      A    No.

23      Q    Your declaration does not contain any margin

24  of error, true?

25      A    It's not a statistical calculation.  There is

1 no margin of error.

2    Q    That's because your calculations are either

3 correct or they're not correct, true?

4    A    No.  The calculations are what the

5 calculations are.  They're not -- there's not a true or

6 false on that.

7    Q    Well, they're either accurate or they're not,

8 right?

9    A    They are accurate for what -- what the

10 calculations mean.

11    Q    Well, if the data on which you relied to come

12 up with your calculation of the amount that the

13 plaintiffs were allegedly underpaid is not accurate,

14 then your calculations and opinions are not accurate,

15 correct?

16         MS. GODDARD:  Objection.  Calls for a legal

17 conclusion.

18         THE WITNESS:  The calculation is a

19 representation of the data that we have.  If the data is

20 not accurate, then the representation of that may not be

21 accurate.  But the calculation with the data that we

22 have represents that data.

23 BY MR. SMEDSTAD:

24    Q    So assuming that all of the data that you

25 analyzed is 100 percent valid and 100 percent accurate

1  as a representation of that which you have been told it

2  is, then your calculations are accurate?

3      A    The calculations are going to be accurate with

4  the data that we have.

5      Q    Because all the calculations are are addition,

6  subtraction, multiplication and division, right?

7      A    Beyond the other factors of getting everything

8  together, yes.

9      Q    Beyond understanding what it is that you're

10  going to add, subtract, multiply and divide, right?

11      A    Yes.

12      Q    I mean, ultimately, the number figures that

13  you offered in this case are all a product of addition,

14  subtraction, multiplication and division?

15          MS. GODDARD:  Misstates the witness's

16  testimony.

17  BY MR. SMEDSTAD:

18      Q    Correct?

19      A    There's more to it, but the ultimate

20  calculations, yes, are that.

21      Q    And there's no purpose in having a margin of

22  error when your calculations are addition, subtraction,

23  multiplication and division, right?

24      A    "Margin of error" is a statistical term, and

25  this is not a statistical calculation.

1    Q    So there's no purpose in having a margin of

2  error in terms of the calculations that you performed?

3    A    I wouldn't -- a margin of error would not come

4  into the discussion of this.

5    Q    But if you are going to offer opinions as to

6  what the ultimate amount of compensation that the

7  plaintiffs are owed, it's important that you understand

8  that you have added and subtracted and multiplied and

9  divided the right numbers, isn't it?

10    A    Yes.

11    Q    But not important enough for you to do

12  anything to validate that those numbers were accurate in

13  this case, correct?

14    A    Again, as I said earlier, I'm not aware of

15  information that would validate this data in a way that

16  would change my opinions.

17    Q    And so you didn't undertake any efforts to

18  validate it?

19    A    I -- I'm unaware of a way to validate this

20  data.

21    Q    The question's a little bit different.

22         You didn't take any efforts to validate the

23  data?

24    A    No.

25    Q    You analyzed driver's logs, correct?

1     A     That's correct.

2     Q     And you analyzed driver logs for Mr. Nance,

3  correct?

4     A     Yes.

5     Q     Who prepared Mr. Nance's driver's logs?

6     A     I assume Mr. Nance did.

7     Q     Wouldn't you have been able to determine

8  whether or not your assumption was correct by talking to

9  Mr. Nance?

10     A     That would be one way to do it, I guess.

11     Q     That would be a way of validating that

12  assumption, right?

13     A     Possibly.

14     Q     Is it possible, or is that a way?

15     A     That is -- it's one of the ways.

16     Q     But you didn't?

17     A     No.

18     Q     Okay.  And wouldn't you have also asked

19  Mr. Nance about his practice in creating the logs to

20  determine whether or not his practice was to create them

21  accurately?

22     A     That would be a way.

23     Q     Why didn't you do that?

24     A     I was not asked to, and I didn't think that --

25  for the purposes of my calculations here of determining

1     A     If we determined that the truck was moving,

2   yes.

3     Q     Well, you don't actually know whether the

4   truck was moving during the entire off-duty or sleeper

5   berth time that you consider compensable, do you?

6     A     Not the entire time, no.

7     Q     Really, all you can tell is whether the truck

8   moved, correct?

9     A     We had looked at a couple of pieces of that,

10  whether the truck moved and what the implied speed of

11  that movement would be.

12    Q     But you only looked at implied speed if one

13  location was within the same city as a duty change,

14  correct?

15    A     We may have looked at it on the broader

16  perspective, but I know that we noted that -- or I noted

17  that in my declaration for the shorter periods of

18  time -- or shorter distances, sorry.

19    Q     Here's what you say.  And I'm looking now at

20  page 5, paragraph 17 of Exhibit 1.

21          "If the same city is listed in the subsequent

22  location, I designated the truck in motion if the

23  implied speed (i.e., distance divided by duration) was

24  greater than 25 miles per hour."

25          That's what you said, correct?

1    A    That's correct.

2    Q    And it doesn't indicate that you did any

3  calculation to determine implied speed other than in

4  that circumstance, correct?

5    A    It would have been a result of the

6  calculation.  I don't know that we spent any great

7  effort looking at that, because usually the distances

8  were much larger once we were outside of the same two

9  cities.

10    Q    Well, I need to know, did your analysis

11  calculate the implied speed for every location change?

12    A    I would need to go back to look at the code.

13  It very well could have been.

14    Q    Well, you apparently didn't disclose it to me

15  or the Court, correct, if you did it?

16    A    No.

17    Q    No, that's not correct?

18    A    No, I did not disclose it.

19    Q    So --

20    A    But --

21    Q    Go ahead.

22    A    Sorry.  But it would be something that would

23  be easily calculable for those points because we know

24  the distance between and the time between, so the

25  implied speed would be an addition, subtraction,

1  multiplication kind of calculation.

2      Q    Why did you not disclose your process in your

3  declaration?

4      A    I'm sorry, what do you mean, "process"?

5      Q    Well, if you in fact calculated implied speeds

6  for other circumstances other than as disclosed in

7  paragraph 17 of your declaration, why wouldn't you have

8  disclosed that to the Court and to opposing counsel?

9      A    I didn't find it to be -- to bear on my

10  opinions and my conclusions.

11      Q    Did you do anything to ensure that the truck

12  was moving during the entire off-duty or sleeper berth

13  time that you considered compensable?

14      A    No.

15      Q    Why not?

16      A    That information was not available.  And we

17  did see periods of time in review of the data, where we

18  would see the truck get to a point and stop moving for

19  longer periods of time.  So there was indications that

20  various entries where they were sleeper berth or

21  off-duty time and the truck wasn't moving at times you

22  would expect it.

23      Q    Not to be moving?

24      A    Not to be moving, yes.

25      Q    In other words, a validation of the log

1  entries as being off-duty or in a sleeper berth?

2     A     Well, if we see sleeper berth and the truck

3  not moving over nights, then that would kind of

4  corroborate the idea that they were parked and sleeping.

5     Q     Do you have any basis on which to opine that

6  the truck was moving during the entire off-duty or

7  sleeper berth time that you considered compensable?

8     A     No.

9     Q     Do you have any training that would allow you

10 to determine whether the truck was moving during the

11 entire off-duty or sleeper berth time that you

12 considered compensable?

13    A     No.

14    Q     If the truck was not in fact moving during the

15 entire off-duty or sleeper berth time that you

16 considered compensable, that would impact the accuracy

17 of your calculations, true?

18    A     To the extent of the time that was -- that it

19 was not moving, yes.

20    Q     So they would be as inaccurate as the time in

21 which the truck was not in fact moving?

22        MS. GODDARD:  Objection.  Vague and ambiguous.

23 BY MR. SMEDSTAD:

24    Q     Right?

25    A     Yes.

1    Q    And you don't know how inaccurate that is, do

2  you?

3    A    We do not have that information.

4    Q    So if you were to take the stand and the judge

5  were to say, "Dr. Krock, I understand that you have

6  determined that some of the time that the plaintiffs

7  marked as sleeper berth or off-duty should be

8  compensable because the truck was moving.  How confident

9  are you in the determination of the amount of time that

10  the truck was moving?"  You would have to say, "I don't

11  know," correct?

12    A    I would say that the information that we have,

13  there are distinct periods of sleeper berth time where

14  the truck is not moving, and sleeper berth time where

15  the truck is moving.

16        I would -- considering the way the logs were

17  filled out, would expect it to be a high degree of

18  certainty that the truck was actually moving when it was

19  sleeper berth and the truck was moving.

20    Q    But the entire time?

21    A    That's very possible, yes.

22    Q    But you have no way of saying, right?

23    A    No.

24    Q    Is that correct?

25    A    That's correct.

1    Q    Do your calculations account for the

2  possibility that a significant portion of the time that

3  you considered compensable because the truck was moving

4  while plaintiff had marked his time as off-duty or in

5  the sleeper berth, that the truck was not in fact

6  moving?

7    A    It really depends on the data and the items.

8  There's -- the data is granular enough that we see

9  shorter periods of time for certain events that are

10  happening in the two- and three-hour range.  So the

11  impact of this, of what you're suggesting, is not

12  really -- the impact, in my review of the data, would

13  be -- would be less -- my expectation of it would be

14  less than significant.

15    Q    Well, let's be clear.  Do you have an opinion

16  as to the amount of time that the truck was actually

17  moving that you incorporated as compensable even though

18  the plaintiff marked their time as off-duty or sleeper

19  berth?

20    A    My assumption is that it was 100 percent of

21  the time.

22    Q    I understand.  But can you actually say that

23  your assumption was correct?

24    A    No.

25    Q    Do you know whether your assumption was

1  correct?

2      A    In my review of the data, I believe it is.

3      Q    Do you know whether your assumption was

4  correct?

5      A    No.

6      Q    Do you know what the plaintiffs were in fact

7  doing during the time that they recorded as off-duty?

8      A    No.

9      Q    Do you know what the plaintiffs were in fact

10  doing during the time they recorded as being in sleeper

11  berth?

12      A    No.

13      Q    Do you have any training that would allow you

14  to determine what the plaintiffs were doing while they

15  were off-duty?

16      A    No.

17      Q    Do you have any training that would allow you

18  to determine what the plaintiffs were doing while they

19  were in the sleeper berth?

20      A    No.

21      Q    For example, do you know whether the

22  plaintiffs were reading, sleeping or surfing the

23  Internet while they were off-duty?

24      A    I don't know.

25      Q    Do you know whether the plaintiffs were

58

1          THE WITNESS:  The answers that I have for the

2    plaintiffs would not be the same answers.  The process

3    still holds.

4    BY MR. SMEDSTAD:

5        Q    And so the answers that you have come up with

6    would no longer be accurate?

7          MS. GODDARD:  Asked and answered.

8          THE WITNESS:  They would be different.  It's

9    not a matter of accuracy.

10   BY MR. SMEDSTAD:

11       Q    Well, aren't you holding yourself out as an

12   expert capable of identifying that which these

13   plaintiffs have been underpaid for work that they

14   actually performed?

15       A    I was given the underlying assumptions to make

16   the calculations.

17       Q    My question's different.

18          Please read my question back.

19          (Record read as follows:

20            "Question:  Well, aren't you

21            holding yourself out as an expert

22            capable of identifying that which these

23            plaintiffs have been underpaid for work

24            that they actually performed?")

25          THE WITNESS:  I've identified periods of time

1      A    Yes.

2      Q    So directing your attention to page 2 of

3  Exhibit 4, it shows that Mr. Freedman went into the

4  sleeper in Keizer, Oregon, correct?

5      A    That's where he was starting at midnight, yes.

6      Q    That's where he went into the sleeper.  That's

7  an activity change, correct?

8      A    Well, he was in the sleeper from 9:00 the

9  previous night, and remained in it until 10:45 the

10  previous morning -- or the next morning --

11      Q    So this starts --

12      A    -- I'm sorry.

13      Q    The next morning?

14      A    The next morning, yes.

15      Q    Okay.  And he left the sleeper and started

16  driving in Springfield, Oregon, correct?

17      A    That's correct.

18      Q    How many hours after he entered the sleeper?

19      A    Approximately 14 hours.

20      Q    Did you count all 14 hours as time that the

21  truck was moving?

22      A    I would need to go back and look at that

23  specific observation, but it would -- I wouldn't know

24  just sitting here today.

25      Q    Well, you told me earlier, and your

1  Google map that we pulled from Google.  And it suggests

2  that there are 71 miles between Keizer, Oregon and

3  Springfield, Oregon.

4          Is that what that looks like to you?

5      A   That's what it says.

6      Q   And it also reflects that it should take about

7  an hour and 13 minutes to drive between Keizer, Oregon

8  and Springfield, Oregon.

9          Does that suggest to you that your inclusion

10  of 10 hours and 45 minutes of moving time was inaccurate

11  if in fact you included that time as moving time?

12          MS. GODDARD:  Objection.  Vague and ambiguous.

13  Lacks foundation.

14          THE WITNESS:  Again, I don't know the

15  specifics of what the truck moved, but this also is a

16  refinement to the analysis that we could perform in the

17  future too.

18  BY MR. SMEDSTAD:

19      Q   Well, let's take for the sake of argument now

20  that in fact it only took an hour and 13 minutes for the

21  truck to move from Keizer to Springfield.

22          All right?

23      A   Okay.

24      Q   And let's also take for the sake of argument

25  that your analysis included the full 10 hours and 45

1  minutes as compensable because you assumed the truck was

2  moving.

3          All right?

4    A    Okay.

5    Q    So that would mean that 9 1/2 hours should

6  have been excluded from compensable time, correct?

7    A    If that's what happened, then yes.

8    Q    Okay.  And under the Oregon analysis, that

9  would result in a decrease in the amount of compensation

10  that Mr. Freedman was owed by 9.5 times 8.5, correct?

11    A    It's a little bit different with the flat wage

12  pay, but...

13    Q    In terms of determining how much he was

14  entitled to?

15    A    Yes.

16    Q    Right?

17    A    Yes.

18    Q    So let's just see if I can use a calculator.

19          9.5 times 8.5 equals $80.75.  Does that sound

20  right to you?  Have I done that correctly?

21    A    It -- roughly, it's fine.

22    Q    Would you like to check it?

23    A    No.  I'm okay.

24    Q    So if you included the full 10 hours and 45

25  minutes and it only in fact took an hour and 15 minutes

1 to get from Keizer to Springfield, that would increase

2 the amount of potential compensable wages by over $80,

3 correct?

4          MS. GODDARD:  Objection.  Incomplete

5 hypothetical.

6          THE WITNESS:  In that particular case, yes.

7 BY MR. SMEDSTAD:

8     Q    Okay.  And that's not an insubstantial sum

9 when you're talking about one day and a total damage of

10 a thousand dollars and change, correct?

11    A    I don't know that I would characterize it as

12 insubstantial or substantial.

13    Q    Well, how much did you calculate Mr. Freedman

14 was owed under all of -- assuming that all of your

15 assumptions were correct under Oregon law?

16    A    Mr. Freedman was $2,234.36.

17    Q    For the entire time, correct?

18    A    For his training period, yes.

19    Q    For training.  And this $80 swing represents

20 an $80 swing in one day, correct?

21    A    Yes.

22    Q    And how many days did Mr. Freedman spend in

23 training?

24    A    I don't know that off the top of my head.

25    Q    Can you take a look at your report and find

1 out?

2    A    I don't know the specific number, but 38 days,

3 approximately.

4    Q    So let's walk through a little math here.  If

5 you take 38 days and multiply it by $80, that gives you

6 $3,040, correct?

7    A    I --

8    Q    Don't take my word for it.  You do it.

9    A    What is the --

10    Q    38 days times $80.

11    A    It's $3,040.

12    Q    Okay.  That's more than the total amount that

13 you have calculated Mr. Freedman is due, correct?

14    A    Yes, but we -- total calculation for

15 Mr. Freedman's sleeper moving time is 273.28.

16         MS. GODDARD:  I think you're looking at the

17 old declaration.

18         THE WITNESS:  This is the old one?  Oh, yeah.

19         Total sleeper moving time for Mr. Freedman was

20 264.20.

21 BY MR. SMEDSTAD:

22    Q    Multiply 264.20 by $8.50.

23    A    8.50?

24    Q    Yeah.

25    A    2245.

1      Q    And is that more or less than the total amount

2  that you calculated he would be due under Oregon law?

3      A    A little bit more.

4      Q    If in fact you counted -- your analysis

5  counted substantial periods of time where the truck was

6  not in fact moving, but you assumed that it was because

7  it changed city location, that could conceptually wipe

8  out, or all but wipe out the entire amount of damage

9  that you're claiming, correct?

10          MS. GODDARD:  Objection.  Incomplete

11  hypothetical.

12          THE WITNESS:  It would depend on the

13  proportion of -- of non-moving time.  And like I said,

14  this is something that we could add as a refinement to

15  the analysis without an issue.

16  BY MR. SMEDSTAD:

17      Q    But we're at class certification right now,

18  and you've offered a declaration that suggests in part

19  that you can do these calculations, and that these

20  calculations are accurate and can be relied upon as

21  accurate, and that it's worthwhile to do it.  And so I'm

22  talking to you about what you've told the Court today,

23  not what you might tell the Court down the road.

24          Based on the analytical exercise that we've

25  just gone through, would you agree with me that it is

1    entirely possible that if we excluded time where the

2    truck was not in fact moving that you counted as

3    compensable, it might wipe out, or all but wipe out the

4    entirety of Mr. Freedman's damages?

5              MS. GODDARD:  Objection.  Lacks foundation.

6    Incomplete hypothetical.

7              THE WITNESS:  Again, it would depend on the

8    amounts of time that we're talking about.

9    BY MR. SMEDSTAD:

10        Q    It could, correct?

11        A    It's possible.

12        Q    Okay.  And we can't tell from your report, can

13   we?

14        A    Can't tell what?

15        Q    Whether it would.

16        A    No.

17        Q    How many of the 264 hours of sleeper or

18   off-duty time that you included as compensable was the

19   truck in fact not moving?

20        A    I don't know.

21        Q    I know you've withdrawn your opinions

22   regarding whether the plaintiffs suffered any damages

23   while they were over-the-road drivers, correct?

24        A    That's correct.

25        Q    And was that a result of your independent

1  exercise of professional judgment?

2      A    No, counsel asked me to withdraw that.

3      Q    And so you did?

4      A    Yes.

5      Q    I do want to talk to you about some of the

6  conclusions that you reached when you analyzed the

7  plaintiffs' over-the-road work.

8          As I understand your calculations, you

9  calculated that under federal law, the plaintiffs were

10 owed nothing if sleeper berth was not compensable,

11 correct?

12     A    That's correct.

13     Q    Did that suggest to you that there was not

14 something systemically problematic about May Trucking's

15 compensation structure?  In other words, that it would

16 necessarily undercompensate the plaintiffs?

17         MS. GODDARD:  Objection.  Vague and ambiguous.

18         THE WITNESS:  Can you read that back, please.

19         (Record read as follows:

20            "Question:  Did that suggest to

21            you that there was not something

22            systemically problematic about May

23            Trucking's compensation structure?  In

24            other words, that it would necessarily

25            undercompensate the plaintiffs?")

1          THE WITNESS:  For the OTR drivers?

2     BY MR. SMEDSTAD:

3          Q    Yes.

4          A    I didn't form an opinion about that.

5          Q    Okay.  And I think you told us that you can't

6     tell, you don't know whether the plaintiffs were

7     properly compensated if you exclude the sleeper berth

8     time you included as compensable, correct?

9          A    I think we would need to go back and re-run

10    the analysis.

11         Q    So you don't know?

12         A    I don't know.

13         Q    Well, don't you know?  If you know the total

14    amount of time, moving time that you included, couldn't

15    you back that out?

16         A    I would prefer to run the analysis and find

17    out.

18         Q    Well, analytically, couldn't you just back it

19    out?

20              MS. GODDARD:  Objection.  Incomplete

21    hypothetical.

22              THE WITNESS:  I'm not 100 percent sure you can

23    do that.

24    BY MR. SMEDSTAD:

25         Q    Why?

1     A     I would like to re-run the analysis and see

2  it.

3     Q     What gives you pause about whether or not you

4  could do it?

5     A     Whether I can back it out?

6     Q     Yeah.

7     A     I can back it out if I had my program.

8     Q     Well, you told me a bit ago that you were able

9  to determine that Mr. Freedman had a total of 264 hours

10  that you included as compensable while he was in sleeper

11  or off-duty, correct?

12     A     Yes.

13     Q     And if you subtracted 8 1/2 times 264,

14  wouldn't that give you your answer?

15     A     I'm not 100 percent sure that's true.

16     Q     Why not?

17     A     I would need to run the analysis.

18     Q     As you sit here today, can you tell me why

19  that's not true?

20     A     No.

21     Q     Okay.  Would you agree with me that 264 times

22  $8.50 is $2,244?

23     A     I think I calculated that shortly before, yes.

24     Q     Would you agree with me that that number is

25  more than your calculation of the total amount that

1  Mr. Freedman alleges to be due under Oregon law?

2      A    It was larger than that number, yes.

3      Q    Do you know whether Oregon's minimum wage law

4  applies to activities that the plaintiffs performed

5  outside of Oregon?

6      A    I -- I'm sorry.

7           MS. GODDARD:  I was going to say, object to

8  the extent it calls for a legal conclusion.

9           THE WITNESS:  I don't.

10 BY MR. SMEDSTAD:

11     Q    You don't know.  Okay.

12          If Oregon minimum wage law does not apply to

13 activities performed outside of Oregon, does your report

14 offer the Court a basis on which to determine which

15 activities were performed in Oregon and which were not?

16     A    It doesn't, but it could be included easily.

17     Q    And again, I'm just talking about what you

18 have chosen to include, sir.

19     A    It doesn't.

20     Q    Okay.  You said it could be included easily,

21 and I want to follow up on that.

22          You told me a bit ago that you have no way of

23 determining how long the truck was in fact moving at any

24 given time, correct?

25     A    That's correct.

1    Q    If you can't tell for certain how long the

2  truck was moving, how can you say which state the truck

3  is in every minute of the day?

4    A    We can estimate that using the points in

5  the -- in the data.

6    Q    But you wouldn't be able to determine, for

7  example, the precise time that the truck crossed the

8  Oregon state line, could you?

9    A    Not with the data that we have, no.

10    Q    And your opinions don't offer the Court any

11  explanation as to how you would go about determining

12  which activities were performed in Oregon and which were

13  performed outside of Oregon, correct?

14    A    It does not.

15    Q    And your report does not reflect how you would

16  go about allocating the pay amongst those activities,

17  does it?

18    A    It does not.

19    Q    So it's fair to say, based on the reports that

20  you have tendered, you have not offered any opinions

21  that you would be able to differentiate work done within

22  Oregon from work done outside Oregon, correct?

23    A    To the extent that -- my understanding is that

24  the FLSA -- FLSA law -- or the FLSA applies outside of

25  Oregon.  If we assume that that's kind of a bottom-line

1  number, and then the Oregon law would be the top-end

2  number, if all activities were involved -- if all

3  activities performed in and outside of Oregon applied to

4  Oregon law, the Oregon number would be the number that

5  applies.  In the alternative, the bottom end of that is

6  the FLSA calculation.

7      Q    And my question was different.

8          As of today, you have not offered an opinion

9  that you are able to differentiate work done within

10 Oregon from work done outside Oregon, correct?

11     A    That's correct.

12     Q    Did you determine where Mr. Freedman was when

13 he elected to idle his truck?

14     A    I'm not aware of a specific idling incident,

15 so...

16     Q    Well, you made a damage calculation relating

17 to deductions for idling, correct?

18     A    I did.

19     Q    Do you know where Mr. Freedman was when he

20 elected to idle his truck?

21     A    I don't believe so.

22     Q    Do you know whether it occurred in Oregon?

23     A    I do not.

24     Q    Did you determine why Mr. Freedman elected to

25 idle his truck?

1   A   No.

2   Q   Did you determine whether Mr. Freedman asked

3   for an exception to the idle policy?

4   A   No.

5   Q   Do you have any basis to determine why

6   Mr. Freedman idled his truck?

7   A   No.

8   Q   Do you have any basis to determine whether he

9   asked his supervisor for an exception to the idle

10  policy?

11  A   No.

12  Q   Do you have any basis to determine what the

13  supervisor's response was?

14  A   No.

15  Q   In your original report -- which you signed,

16  right?

17  A   I did.

18  Q   And you ensured that it was accurate?

19  A   Yes.

20  Q   You indicated on paragraph 28 that he had --

21  he, Mr. Freedman, had two deductions for idling totaling

22  $18.99, correct?

23  A   That's what it says in here, yes.

24  Q   That's not right, is it?

25  A   It doesn't appear so, no.

118

1          CERTIFICATION OF DEPOSITION OFFICER

2

3          I, CHERYL SLETTA, RPR, CSR, duly authorized to

4   administer oaths pursuant to Section 2093(b) of the

5   California Code of Civil Procedure, hereby certify that

6   the witness in the foregoing deposition was by me sworn

7   to testify to the truth, the whole truth and nothing but

8   the truth in the within-entitled cause; that said

9   deposition was taken at the time and place therein

10  stated; that the testimony of the said witness was

11  thereafter transcribed by means of computer-aided

12  transcription; that the foregoing is a full, complete

13  and true record of said testimony; and that the witness

14  was given an opportunity to read and correct said

15  deposition and to subscribe the same.

16          I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, or in any way

19  interested in the outcome of this cause named in said

20  caption.

21

22

23

24                          _____

                            Cheryl Sletta

25                          RPR, CSR No. 7354

1          BE IT REMEMBERED THAT, the deposition of LISA DAVIS

2     was reported by Mary C. Soldati, Registered Professional

3     Reporter, on Thursday, January 31, 2013, commencing at

4     the hour of 9:00 a.m., the proceedings being reported in

5     the Offices of Stoll Berne, 209 S.W. Oak Street, Suite

6     500, Portland, Oregon.

7

8     APPEARANCES:

9        PATTERSON LAW GROUP

10       By Allison H. Goddard

11       402 West Broadway, 29th Floor

12       San Diego, California  92101

13       619.398.4762

14       ali@pattersonlawgroup.com

15       Appearing on behalf of the Plaintiffs

16

17       SCOPELITIS GARVIN LIGHT HANSON & FEARY

18       By James H. Hanson

19       10 West Market Street, Suite 1500

20       Indianapolis, Indiana  46204

21       jhanson@scopelitis.com

22       317.492.9205

23       Appearing on behalf of the Defendants

24

25    Also present:  Christopher Simons

1                         I N D E X

2

3    DEPONENT:                EXAMINATION

4    LISA DAVIS

5    By Ms. Goddard              4

6    By Mr. Hanson               51

7

8

9

10                      E X H I B I T S

11

12   NO.                    DESCRIPTION                PAGE

13

14   32              May Trucking Webpage Printout     47

15   33              Online Application Page           48

16

17

18

19

20

21

22

23

24

25

Appx. 302

Appx. 191

P R O C E E D I N G S


LISA DAVIS,

was thereupon produced as a witness and, after having

been sworn on oath, was examined and testified as

follows:


EXAMINATION

BY MS. GODDARD:

Q.  Good morning, Miss Davis.  We met briefly, but

I'm Allison Goddard and I represent the Plaintiffs in

this case.  Have you ever been deposed before?

A.  No.

Q.  I'm just going to go over some ground rules for

the deposition.  The most important one is that you

understand that the testimony you're giving today is

under oath, as if you were sitting in the witness chair

in a court of law.  And you're obligated to tell the

truth at all times; do you understand that?

A.  I do.

Q.  I'm going to be asking a series of questions.

And it's a bit of a stilted approach, because the court

reporter has to take down everything we say.

So once I ask my question, if you will just pause

briefly, your attorney, Mr. Hanson, may want to

1     stationed in Colton, California?

2         A.  I think since -- I don't know.

3         Q.  Okay.  Do you know the name of that person?

4         A.  Katie Law.

5         Q.  L-A-W?

6         A.  Mm-hmm.

7              MR. HANSON:  You need to answer audibly.

8         A.  Sorry, yes.

9         Q.  After a driver is invited to attend an

10    orientation, does a recruiter have any role in

11    scheduling the logistics of how the driver is going to

12    get there, where they're going to stay?

13        A.  Yes.

14        Q.  Is that part of their responsibilities?

15        A.  Yes.

16        Q.  Can you describe briefly what they do in that

17    respect?

18        A.  They set up a hotel, if they need one and bus, if

19    they need one, that is if it's a time that we're

20    actually paying for those things.

21        Q.  Okay.  So at some point in time the company

22    didn't pay for bus or hotel?

23        A.  It depends on how full the trucks are.  If we're

24    needing drivers, then we'll pay for them.  If our trucks

25    are full and we don't need as many drivers, then we

MR. SIMONS:  S-P-R-E-A-D-B-O-R-O-U-G-H.

Q.  Okay.  I got that now.

A.  But we -- you said earlier we don't pay during orientation.

Q.  I understand that.  So my question was, is there any sort of written directions for recruiters to follow when someone asks -- a driver asks if they're going to be paid for orientation?

A.  A set of instructions, no, other than saying they wouldn't be paid during orientation.

Q.  Okay.  It's not in the recruiting script, for example?

A.  I don't think so.

Q.  And do you know if recruiters are instructed in writing in any way about how to address driver questions about whether or not they'll be able to got a job through this process?

A.  Well, basically this is the interview process. And just like any interview process, you know, if we feel that they're a good candidate, then they may be hired.

Q.  Are you familiar what part of the orientation involves -- that session at the company's facilities involves an interview?

A.  I think it's more -- and we don't sit down and

1    A.  Yes, I do.  It's just the performance history

2  request asking them if they've been in any accidents and

3  their previous employer.

4    Q.  Is it part of an application packet?

5    A.  I don't think so.

6    Q.  Okay.  Is it the type of information that would

7  either qualify or disqualify a driver?

8    A.  It may.

9    Q.  For example, if they had a previous accident,

10  that disqualified them?

11    A.  It could.

12    Q.  Does the company try to find that out before they

13  bring them up for orientation?

14    A.  We would prefer it.

15    Q.  Is it the typical standard practice to find that

16  out before orientation?

17    A.  We like to find out as much as we can, so we're

18  not wasting money getting that driver to orientation

19  and finding a surprise.

20    Q.  Of course.  I'm going to show you what's been

21  marked as Exhibit 15.  Just look at the first few pages

22  of Exhibit 15.  Looks like Pages 492 through 497.  It

23  looks like it's all part of the same form.  If not just

24  correct me, please.

25    A.  Looks like the driver qualification form.

1    A.  I do.

2    Q.  Is this something that the company typically asks

3    drivers to complete before orientation?

4    A.  I don't know.

5    Q.  Well, when you were the recruiting department

6    manager, is this information that you asked recruiters

7    to collect from drivers?

8    A.  I don't know.  At this period of time, when I was

9    recruiting manager, I managed the employees only.  I had

10   nothing to do with the paperwork at this time.

11   Q.  Okay.  Who was monitoring the employees to make

12   sure that they got the proper paperwork in order?

13   A.  The processing department manager, Kory Knox.

14   Q.  Do you know if the company holds orientation

15   sessions at any other location other than Brooks,

16   Oregon?

17   A.  They do.

18   Q.  Do you know what other locations?

19   A.  I do.

20   Q.  What other locations?

21   A.  Pensacola, Florida, Gary, Indiana, Denver,

22   Colorado, Payette, Idaho, Layton, Utah and Phoenix,

23   Arizona.

24   Q.  Do you know how long the company has been having

25   orientation sessions at Pensacola?

Appx.  307

Appx.  196

1

2                          CERTIFICATE

3    State of Oregon

4    County of Multnomah

5        I, Mary C. Soldati, Registered Professional Reporter

6    and Notary Public in and for the State of Oregon, do

7    hereby certify that LISA DAVIS, was satisfactorily

8    identified and was duly sworn by me, and that such

9    deposition is a true record of the testimony given by

10   the witness.

11       I further certify that I am neither related to

12   nor employed by any of the parties in or counsel to this

13   action, nor am I financially interested in the outcome

14   of this action.

15       In witness whereof, I have hereunto set my hand

16   this 16th day of February, 2013,

17

18

19                   Mary C. Soldati, RPR

20

21

22   My commission expires:

23   October 28, 2014

24

25